Filed 4/30/15  In re Zoe O. CA4/3
Received for posting 5/4/15

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re ZOE O. et al., Persons Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOEL O. et al.,<br><br>    Defendants and Appellants. | G050657<br><br>(Super. Ct. Nos. DP023355,<br>                        DP023356,<br>                        DP023357)<br><br>O P I N I O N |

        Appeal from orders of the Superior Court of Orange County, Andre Manssourian, Judge.  Affirmed.

        William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant Christy O.

Jacob I. Olson, under appointment by the Court of Appeal, for Defendant and Appellant Joel O.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Jeannie Su, Deputy County Counsel, for Plaintiff and Respondent.

\*　　　\*　　　\*

Joel O. (Zoe's father) and Christy O. (mother) appeal from the juvenile court's August 27, 2014, orders denying their petitions to change the order that terminated reunification services (Welf. & Inst. Code, § 388; all statutory citations are to this code) and the order terminating parental rights (§ 366.26).  We affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

We described the factual and procedural history leading to the termination of reunification services in *Joel O. et al. v. Superior Court* (*Orange County Social Services Agency*) (March 27, 2014, G049398 (nonpub opn.).  To briefly summarize, in December 2012 the Orange County Social Services Agency (SSA) filed a petition alleging Ro. (born October 2005), R. (born May 2007), and Zoe (born June 2011) came within the juvenile court's jurisdiction under section 300, subdivision (b), because they had suffered, or there was a substantial risk they would suffer, serious physical harm or illness as a result of the parents' inability to supervise or protect them adequately, and to provide regular care due to the parents' mental illness or substance abuse.  The petition cited a November 15, 2012, domestic violence incident between the parents, ongoing domestic violence since May 2012, prior domestic violence between mother and M.S.,[1] the father of Ro. and R., substance abuse by mother and M.S., mother's and M.S.'s mental health issues, excessive physical discipline by Joel (Zoe's father), and a burn injury suffered by Zoe.

---

[1]　　M.S. did not appeal from the order terminating his parental rights.

2

The juvenile court ordered reunification services, including parenting programs, drug testing, substance abuse treatment, and a domestic violence program.  In December 2013, the court terminated reunification services and set a section 366.26 hearing for April 2, 2014.  The court found SSA offered the parents reasonable reunification services, the parents failed to participate regularly and make substantive progress in court-ordered treatment programs, return of the children to the parents would create a substantial risk of detriment to their safety or well-being, and there was no reasonable likelihood additional services would create a substantial probability the children could be returned by the 12-month review.

In June 2014, Joel (Zoe's father) filed a section 388 change of order request, as amended July 29. He asserted he had made substantive changes in addressing the issues leading to Zoe's removal, accomplished the objectives of the case plan, specifically the need to address his history of domestic violence, and now possessed the skills and judgment to have Zoe returned to his care.  He pointed to his completion of a 52-week probation department batterer's intervention program with favorable evaluations, and records from Orangewood visitation monitors showing appropriate and positive interactions with Zoe.  He asked the court to find Zoe's return to him with family maintenance services would not create a substantial risk of detriment to Zoe's health and well-being, and he asked the court to schedule a six-month review.  Alternatively, he asked the court to resume family reunification services with a 60-day trial reunification period or liberalized visitation.  He asserted he had maintained regular and consistent visitation, Zoe was "extremely bonded" to him, and termination of his parental rights would cause Zoe permanent emotional damage.

Mother filed her own section 388 petition in July 2014.  She asserted she had finished her case plan objectives and now had the necessary skills and judgment to have the children returned to her care.  She cited her completion of a personal empowerment program (PEP) through Human Options in December 2013, participation

3

in a domestic violence support group and completion of a 12-week domestic violence parenting program through Interval House in December 2013, two parenting classes at Human Options, completion in March 2014 of a 16-week substance abuse treatment program through Mariposa, including drug testing and counseling, and completion of a mental health evaluation through the Orange County Healthcare Agency. Mother stated she had arranged suitable housing for her and the girls and planned to continue with substitute teaching, and her visits had been consistent and positive. She claimed the older girls stated they wanted to return to her care and asserted reunification was in the children's best interests because they otherwise would suffer emotional damage, harm, and detriment. She asked the court to return the girls with family maintenance services, or to resume family reunification services with a 60-day trial reunification period or liberalized visitation.

The juvenile court conducted a hearing on the section 388 petitions and section 366.26 issues over several days in late July and August 2014. The court admitted SSA's reports, and the parents, the social worker, Ro. and R., and other witnesses testified. In late August 2014, the juvenile court denied the section 388 petitions and terminated parental rights. It found the children were adoptable and the children would not suffer detriment from the termination of parental rights.

II

DISCUSSION

A.   *Mother's Appeal -- Visitation Issues*

Mother complains the social worker advised Ro. she could refuse visits, Ro. refused nine or 10 visits between February and July 2014, and the missed visits resulted in the erosion of the parent-child relationship. Mother contends the juvenile court erred in failing to rectify its failure to enforce the visitation order by granting her section 388 petition.

4

In the April 2014 initial report prepared for the section 366.26 hearing, the social worker noted visits between mother and the girls occurred twice a week for two hours each. Visits remained monitored, and the social worker had not increased visitation due to mother's lack of case plan compliance. The social worker described visits as initially inconsistent because mother would make, but not keep, promises to the girls, and did not act in a parental role regarding their behaviors. She also refused to listen to the girls' disclosures concerning Joel. Mother was generally appropriate with the girls however. She brought food and activities to visits. The girls usually reported enjoying their time with mother. But according to the monitor, at the conclusion of a visit the girls were "ready to go, they said goodbyes quickly and did not prolong" them. This contrasted with leaving the foster home, where the girls would "linger with the caretakers and hug them repeatedly" such that it was "hard to get them into the car" to leave for visits with mother.

Ro., now in third grade, was generally outgoing and helpful, but struggled with behavioral issues, including tantrums. She had adjusted well in the foster home. She called the foster parents "mom" and "dad," and appeared to have developed a strong attachment to the couple. Ro. expressed disappointment with mother and mother's relationship with Joel. Ro. said her favorite part of visits with mother was "leaving."

Mother missed scheduled visits on January 2, January 30, and February 12, 2014. On January 16, the caretaker reported Ro. returned from the previous two visits (January 9 and January 15) visibly upset and with an upset stomach. Mother claimed Ro. had requested to speak with Joel so he could apologize. But Ro. reported mother told her Joel wanted to apologize to the girls.

Before a visit on February 13, 2014, Ro. balled up in the back seat of the car and refused to get out. The social worker sat with Ro. and "reassured her that if she did not want to go to the visit she was old enough to make that choice and [Ro.] then appeared to calm down. The [social worker] asked her if she would be open to talking

5

. . . and she nodded her head, yes. The [social worker] explained that anytime [Ro.] did not feel like visiting she just had to tell her caretakers or she could call the [social worker] herself, and she agreed to do this. [Ro.] stated that she just did not want to see her mother and she wanted to spend time with Jen and Gabe."

Ro. did not attend the visit on February 13. On February 19, the social worker had to encourage Ro. to remain at the visit. She told Ro. a psychiatrist performing a bonding study, Gerardo Canul, would be there as well. Ro. said she would stay, but wanted to leave when Canul was done, and wanted the social worker to stay with her. Ro. resisted hugging mother in the visiting room and ended the visit early. On February 20, Ro. decided not to visit mother, explaining, "I don't think I want to do visits anymore" because she wanted to stay with the foster parents. On February 26, Ro. initially stated she did not want to go to the visit, but changed her mind after seeing her sisters getting ready. She stated she did not want mother to ask her why she was not going.

In late February, the social worker learned mother gave the girls gifts and told them they came from the former caretakers. Mother told the girls the former caretakers loved them, missed them and wished they could live with them. Mother also hid notes in the gifts. The social worker advised mother gifts required prior approval and inspection.

Ro. chose not to attend a visit on April 16, 2014, and asked to leave early during multiple visits. A report dated May 7 noted Ro. chose not to attend visits on April 16, 17 and 30, and asked to leave early during multiple visits. On April 23, Ro. told the social worker she did not attend the visits because she wanted to stay home with the caretakers. Mother arrived 25 minutes late to the April 23 visit, and cancelled a visit on April 24. SSA's June 30 report noted visits on May 29 and June 19 were terminated because mother arrived late. Ro. chose not to attend visits on May 15, June 11, and June

6

18. SSA's July 29 report reflected neither parent had missed any visits since the previous report.

Mother forfeited the visitation issue because she did not complain in the juvenile court while the case was pending and after Ro. began refusing visits, nor did she raise it in her petition or at the hearing on her petition. (*In re Dakota S.* (2000) 85 Cal.App.4th 494, 501-502 [claims not raised in juvenile court are forfeited on appeal].) Had she alerted the juvenile court of her concerns when the problem initially arose, the court may have persuaded Ro. to attend visits. Alternatively, the court may have determined forced visitation was detrimental. (See § 366.21, subd. (h).)

Even assuming no forfeiture, mother's claim fails on the merits. Mother relies on *In re Hunter S.* (2006) 142 Cal.App.4th 1497 (*Hunter S.*). There, the appellate court reversed an order denying the mother's section 388 petition: "While the court granted visitation in theory, none was permitted in reality. This situation was, to some extent, the consequence of decisions made by [the boy's] therapists to give the child time to come to terms with his negative feelings about [the mother]. In the end, however, [the boy] himself was given virtually complete discretion to veto visitation, and indeed all contact, with his mother, a discretion he exercised without any oversight or direction by the court. This was clearly improper. The juvenile court cannot impermissibly delegate to the child's therapist, DCFS or any third person, unlimited discretion to determine whether visitation is to occur. [Citation.] In no case may a child be allowed to control whether visitation occurs." (*Hunter S.*, *supra*, 142 Cal.App.4th at p. 1505; see *In re S.H.* (2003) 111 Cal.App.4th 310, 313 [where court grants visitation it must ensure some visitation at a minimum level determined by the court occurs]; *In re Nicholas B.* (2001) 88 Cal.App.4th 1126, 1138-1139 ["[V]isitation may not be dictated solely by the child involved"].)

*Hunter S.* is distinguishable. There, the mother was denied almost all visits and contact with her son over a three-year period. The mother in *Hunter S.* repeatedly

7

asked DCFS and the court for assistance in enforcing the visitation order. The appellate court characterized mother as without "fault," at least as it concerned visitation. (See *Hunter S.*, *supra*, 142 Cal.App.4th at p. 1508 ["Through no fault of her own, [the mother] was denied any opportunity to" maintain consistent contact and visitation].)

Here, Ro. refused nine or 10 visits over the course of eight months of twice weekly visitation. Mother did not ask SSA and the court for assistance and raises the claim for the first time on appeal. Ro. began resisting visits only after mother missed scheduled visits and encouraged a rapprochement with Joel. Mother attempted to subvert Ro.'s relationship with the current caretakers by supplying gifts, ostensibly from the former caretakers, with hidden notes, and telling the girls the former caretakers loved them, missed them, and wished they could live with them.

Finally, to the extent mother appears to complain SSA did not liberalize visits, mother failed to ask the juvenile court to increase visits. Indeed, the juvenile court usually reduces visitation once the court terminates reunification services and sets a date for the section 366.26 hearing. At this stage, the focus of the dependency shifts from the parent's interest in reunification to the child's need for permanency and stability. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).) The juvenile court therefore did not err by denying mother's section 388 petition.

B.    *Joel's Appeal – Denial of Section 388 Petition*

Joel contends the juvenile court abused its discretion by denying his section 388 petition. He notes the juvenile court found he demonstrated a change of circumstances, but he argues the court abused its discretion by finding a modification of the prior order terminating reunification efforts would not have served Zoe's best interests.

A juvenile court order may be changed, modified, or set aside under section 388 if the petitioner establishes by a preponderance of the evidence that (1) new evidence or changed circumstances exist, and (2) the proposed change would promote the best

8

interests of the child.  (*Stephanie M., supra,* 7 Cal.4th at pp. 316-317.)  The parent bears the burden to show both a legitimate change of circumstances and that undoing the prior order would be in the best interest of the child.  (*In re Kimberly F.* (1997) 56 Cal.App.4th 519, 529 (*Kimberly F.*).)  Generally, the petitioner must show by a preponderance of the evidence the child's welfare requires the modification sought.  (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1228.)  The petition is addressed to the sound discretion of the juvenile court, and its decision will not be overturned on appeal in the absence of a clear abuse of discretion.  (*Stephanie M., supra,* 7 Cal.4th at p. 318; *In re S.J.* (2008) 167 Cal.App.4th 953, 959.)

Because the juvenile court found Joel met his burden to show a legitimate change of circumstances, we turn to Joel's claim the evidence presented at the hearing showed Zoe would benefit from an order granting his section 388 petition.  He argues he acted as Zoe's primary caretaker during her first 18 months of life, their bond remained strong during the course of the dependency through consistent and meaningful visitation, and he had secured stable housing, was attending college, and had obtained employment.

Under section 388's best interests test, the juvenile court examines a number of factors, including the nature and gravity of the reason for the dependency and why the parent failed to overcome these problems by the final review, the strength of the existing bond between the parent and child, the strength of the bond to the present caretakers and the child, the length of time a child has been in the dependency system, and the nature of the parent's change, the ease by which the change could be brought about, and the reason the change was not made earlier.  (*Kimberly F.*, *supra*, 56 Cal.App.4th at pp. 530-532.)

Here, the primary reason for the dependency was domestic violence.  Both parents also tested positive for methamphetamine during the reunification period, and had issues with providing adequate housing and maintaining employment.  Joel completed a 52-week batterer's program, required as part of his criminal court probation, shortly

9

before the hearing on his section 388 petition. He received what the court described as "high marks" from his counselor, who also testified on Joel's behalf at the hearing on his section 388 petition. Joel tested clean for drugs after an early positive test. The court agreed there was evidence Joel continued to have anger problems, but the court concluded Joel had made substantive progress on the issues that brought Zoe before the court.[2]

Joel cited a "very strong" bond between him and Zoe. He testified he cared for Zoe as a stay-at-home father until she was taken into protective custody, and during visits she always kissed and hugged him at the beginning and end of visits, she told Joel she loved him, and sometimes called him "dad," "daddy," or "dada." During visits Zoe came to him and put her head on his lap.

The social worker described the quality of Joel's visits as fair. He had visited Zoe two hours per visit, twice a week, since the beginning of the case, but had not asked to liberalize visits. He always showed up on time, he usually brought food, and visits consisted of friendly play. Zoe was affectionate with father. The monitors' notes reflected Zoe sought attention from father and described their visits as "great and appropriate." According to the social worker, Zoe was playful and engaged when Joel was present, but when the visit was over she was quickly ready to leave him to go to the foster parents, with whom she had lived for more than 18 months. Sometimes Zoe would push Joel away when he tried to give her affection and she never asked to stay with him.

_____

[2]     The social worker testified Joel had not provided her with updates to allow her to assess whether he could apply what he learned to real life situations. He continued to react with "tense body language" when she gave him direction. She cited a visit at Orangewood where she tried to have a conversation with him after a visit, but he showed an intensity of anger in his tone, tense jaw, posture, and eyes suggesting he could still not control or contain his emotions. During his testimony, Joel minimized the incident leading to the dependency as an "argument," although evidence demonstrated it involved physical violence. The older girls expressed continuing fear of Joel and asserted he had used physical violence against the children. The social worker believed Joel still had anger issues and she saw no change in his behavior.

On the other hand, Zoe was very affectionate with the caretakers and sought them out for all her needs. She responded well to them when they gave direction, and always appeared happy, loving, and playful. The social worker concluded it would be "very hurtful" for Zoe to leave the foster home.

The court found it was not in Zoe's best interests to grant the petition because of her strong bond with the caretakers and her sisters. "[A]ll three of these children are thriving in the home of the caretakers . . . . They're all very attached and bonded to the foster parents. In particular I heard testimony from [the social worker] that Zoe . . . is particularly attached and bonded to the foster father . . . . In short, I am more impressed by the bond she has with them than the bond she has with" Joel. The court also found Zoe's relationship with Ro. and R. was "tremendously important" and it was a "sacred life-long bond." The court noted that while Joel might facilitate visits with Zoe's sisters, that "wasn't good enough." The court stated it was not prepared to "rip Zoe out of the caretakers' home and . . . break up the sibling set."

Here, the court weighed the strength of the existing bonds and emotional attachment between Zoe and Joel on one hand, and between Zoe and her caretakers and sisters on the other. Zoe had been in the dependency system and living with the foster parents approximately 20 months at the time of the section 388 hearing. The evidence disclosed that while she and Joel had friendly and loving visits, she easily separated from him at the end of those visits. She was excited to return to the foster parents, who provided her with daily care, support, and affection. The court found Zoe had a stronger attachment to the caretakers and to her sisters than she did to Joel, and we cannot say the court erred in arriving at this conclusion. The court did not abuse its discretion in determining it was not in Zoe's best interests to grant Joel's section 388 petition.

11

C.   *Joel's Appeal – Section 366.26 Issues*

Joel also argues the juvenile court erred by failing to apply the parental benefit exception (§ 366.26, subd. (c)(1)(B)(i)) to avoid terminating his parental rights. The court did not err.

Section 366.26 provides that after reunification efforts have failed and the court finds the child is likely to be adopted, "the court shall terminate parental rights" (§ 366.26, subd. (c)(1)), unless specified circumstances exist.  One exception is where "[t]he court finds a compelling reason for determining that termination would be detrimental" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)

To apply the statutory exception, the child must "benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  The benefit exception "does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent."  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348 (*Jasmine D.*).)  To the contrary, once the mandated period for reunification has passed, the parent bears the burden of proving that termination of parental rights will be detrimental to the child.  (*Id.* at p. 1350.)  After reunification efforts end, the Legislature's preferred permanent plan calls for termination of parental rights and subsequent adoption.  (*In re Jose V.* (1996) 50 Cal.App.4th 1792, 1799; *In re Cody W.* (1994) 31 Cal.App.4th 221, 227-231.)  "Adoption is the Legislature's first choice because it gives the child the best chance at . . . commitment from a responsible caretaker.  [Citations.]"  (*Jasmine D.,* at p. 1348.)  Thus, the benefit prong of section 366.26, subdivision (c)(1)(B)(i), is satisfied only if "the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents."  (*In re Autumn H.* (1994) 27 Cal.App.4th

12

567, 575 (*Autumn H.*).) "In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*Ibid.*) The court's balancing of competing considerations must be performed on a case-by-case basis, taking into account variables such as the child's age, "'the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs. [Citation.]'" (*Jasmine D.,* at pp. 1349–1350; *Autumn H.,* at pp. 575–576.)

The party seeking to establish the existence of the parental benefit exception bears the burden to produce that evidence. (*In re Megan S.* (2002) 104 Cal.App.4th 247, 252.) The appellate court will not disturb the juvenile court's balancing of interests unless the order is not supported by substantial evidence (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 425), or the court abused its discretion (*Jasmine D., supra*, 78 Cal.App.4th at p. 1351; see *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 [substantial evidence standard of review applies to existence of a beneficial parental or sibling relationship; abuse of discretion standard applies to whether existence of relationship constitutes a compelling reason for determining that termination would be detrimental]; *In re Emmanuel R.* (2001) 94 Cal.App.4th 452, 465 [appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason; when two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court].)

Similar to the argument in support of his section 388 petition, Joel argues Zoe felt a strong bond to him because she was 18 months old when she was removed from his care, she had never been separated from him, during their visits following removal, Zoe would run to her father to embrace him, and their visits generally ended with hugs and kisses.

13

Joel consistently participated in positive weekly visits with Zoe, and Zoe enjoyed her visits with Joel and acted affectionately toward him. But substantial evidence supports the juvenile court's finding Zoe's relationship with Joel did not promote her well-being to the extent it outweighed the benefits she would gain in a permanent home with her adoptive parents. Zoe was removed from Joel's custody at 18 months of age and had lived in the foster home for more than half her life. Joel had never progressed beyond monitored visits. (*In re Andrea R.* (1999) 75 Cal.App.4th 1093, 1109 [parent's failure to progress beyond monitored visitation with a child justifies order terminating parental rights].) The evidence of friendly and affectionate visits fall short of the compelling reasons necessary to outweigh the stronger preference for adoption. (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1350.) The record does not reflect Zoe's relationship with Joel was so "emotionally significant" that losing that relationship would be so detrimental as to preclude placement in a permanent home. (*In re S.B.* (2008) 164 Cal.App.4th 289, 298 [child loved the father, wanted their relationship to continue, derived some measure of benefit from his visits, and a psychologist testified that due to a "'fairly strong'" bond there was a potential for harm to the child in losing the parent-child relationship].) The court did not err by failing to apply the parental benefit exception to avoid terminating his parental rights.

## III

### DISPOSITION

The orders denying the section 388 petitions and terminating parental rights are affirmed.

ARONSON, ACTING P. J.

WE CONCUR:

FYBEL, J.

IKOLA, J.